565 So.2d 96 (1990)
Travis HUMPHRIES, individually and as co-executor of the estate of Bernice M. Whiteley, deceased, and Gwinnette Meyers
v.
Robert F. WHITELEY, individually and as co-executor of the estate of Bernice M. Whiteley, deceased, et al.
88-614.
Supreme Court of Alabama.
April 6, 1990.
Rehearing Denied June 22, 1990.
*97 Walter J. Price, Jr. of Price & Smith, Huntsville, for appellants.
Bill G. Hall of Berry, Ables, Tatum, Little & Baxter, Huntsville, for appellees.
STEAGALL, Justice.
This appeal involves reciprocal wills made by a husband and wife, each of whom had children by a former marriage, and whose children were made beneficiaries of the estate of the surviving party. The trial judge found that the surviving spouse had violated the provisions of the reciprocal will by inter vivos transfers to her own children to the exclusion of her stepchildren.
Frank and Bernice Whiteley's reciprocal wills contained the following clauses:
"THIRD ITEM: At my death I hereby give, devise and bequeath all the rest and residue of my estate, both real and personal, wheresoever situate, unto my spouse in absolute fee simple.
". . . .
"FIFTH ITEM: My spouse and I are executing our wills at or about the same time and such wills are intended to be and should be construed [as] contractual and reciprocal wills. Neither wills [sic] shall be subject to revocation by it's [sic] maker without the consent of the other party."
Bernice's will also contained the following:
"[I]n the event my said spouse shall predecease me, then in such event I give, devise and bequeath all my estate, both real and personal, wheresoever situate, of which I may die seized or possessed, or to which I may be or become entitled to have any interest or over which I may have any power of appointment, unto my children, Gwinnette Meads Bates and Travis Humphries, and my husband's children, Morris W. Whiteley, Bobby Whiteley, David Whiteley and Lanny Whiteley, in equal shares, share and share alike, in absolute fee simple, per stirpes and not per capita."
Frank's will also had a similar provision to leave all his property to all their children equally in the event that Bernice died first.
Frank died first, and Bernice took title to all their property and began making gifts to her children. By the time of Bernice's death, the total estate had been reduced somewhat significantly, and after her death, Bernice's children sued for a declaratory judgment to determine how Bernice's estate was to be handled and to have Robert F. Whiteley, Frank's son, removed as a co-executor. The defendants, Frank's children, filed a counterclaim to have set aside all the gifts that Bernice had made to her children. After an ore tenus hearing, the trial judge ruled in favor of Frank's children *98 and set aside the gifts from Bernice to her children. Bernice's children appealed.
The trial judge made the following findings of fact and conclusions of law in his order:

"Findings of Fact
"Frank and Bernice Whiteley were married in 1969. Each then had children from previous marriages. The children of Bernice Whiteley are the plaintiffs in this action: namely, Travis L. Humphries and Gwinnette Meyers. The children of Frank Whiteley are the defendants, and they are: Robert F. (Bobby) Whiteley; Morris W. Whiteley; Lanny Whiteley; and David Whiteley.
"On 13 September 1978, Frank and Bernice Whiteley met with attorney Douglas Claude Martinson to discuss the preparation of wills. Mr. Martinson testified that the Whiteleys wanted whatever property was left at the death of the last of them to die to go to their children, in equal shares. Martinson said that he discussed several approaches with the Whiteleys: e.g., two wills with an agreement not to revoke; a testamentary trust; an inter vivos trust; a life estate; and a joint will. The Whiteleys selected the option of `reciprocal wills, along with an agreement not to revoke or change their respective wills.' Mr. Martinson said he then advised the Whiteleys that such an approach only would apply to the property remaining after both had died, and that it would not prevent a survivor from giving property away before then. `I warned them that all this would do is take care of what was left at' the death of the last of them to die, `but in the meantime, one of them [the last to die] could mortgage it, sell it, or give it away.' Mr. Martinson also told the Whiteleys they could prevent the survivor from giving away all property prior to death by creating a trust, but neither Mr. nor Mrs. Whiteley wanted the other to become involved in complicated estate arrangements. According to Mr. Martinson, the Whiteleys therefore agreed to `take that chance.' `They did not want to restrict' one another's power `to dispose, or use, or have complete control' over property during the lifetime of the last of them to die. Nevertheless, Mr. Martinson added in a prescient phrase, the Whiteleys `presumed... there would be some assets left' for division among their children at the death of the last of them to die.
"Mr. Martinson then prepared the subject wills, which were executed in his office the following weekon 21 September 1978.
"Based upon all evidence submitted, this Court finds that neither Mr. nor Mrs. Whiteley wanted the other to become involved in complicated estate arrangements, such as a trust, because: (i) the Whiteleys were not wealthy, and they feared the erosion of their joint assets by extraneous administrative expenses; and (ii) neither Whiteley was in particularly good health, and they consequently did not want the other to be handicapped by a trust officer in using the assets of their joint estates for basic needs and necessitiessuch as food, clothing, and shelteror medical & hospitalization expenses. Nevertheless, this Court also infers that the Whiteleys selected the option of reciprocal wills and an agreement not to revoke their respective wills because neither intended for the other to disproportionately favor the survivor's children in the distribution of assets, to the detriment of the children of the first to die.
"Frank W. Whiteley died on or about 12 March 1983.
"Six days later, on 18 March 1983, a safe deposit box was opened in the names of Mrs. Bernice Whiteley, Travis Humphries, and Gwinnette Meyers at the First Alabama Bank branch on University Drive in Huntsville.
"On 21 March 1983, Mr. Martinson read Frank Whiteley's will and the agreement not to revoke to Bernice Whiteley, Robert Whiteley, Lanny Whiteley, and David Whiteley. Waivers then were executed by all of the aforesaid.
"On 2 April 1983, Travis Humphries and Bernice Whiteley opened a joint checking account `with [right of] survivorship' at the Bank of Ardmore, in Ardmore, Tennessee.
*99 "On 6 May 1983, Travis Humphries opened a savings account in his name alone at the Bank of Ardmore, and deposited four checks drawn payable to Bernice Whiteley, and aggregating $9,111.11, into that account.
"On 30 November 1983, after the six months statutory period for filing a claim against the estate had passed, Mr. Martinson sent a letter to Mrs. Whiteley, which explained the extent of her interest in the property inherited from her deceased husband.
"At some point, Mrs. Whiteley permitted the defendants to have sentimental heirlooms which had belonged to their father. These heirlooms included: old wicker furniture, a dining room table and chairs, and a shotgun.
"In February of 1984, Gwinnette Meyers moved to Madison County, Alabama, for the purpose of taking care of her mother. Allegedly, Bernice Whiteley then was quite ill and required continuous, twenty-four hour care: Mrs. Whiteley is reported to have suffered from asthma, bronchitis, arthritis, emphysema, a heart condition, and high blood pressure, among other ailments. Additionally, Mrs. Whiteley ingested as many as twenty-seven different kinds of medication each day, and frequently required hospitalization.
"Following her husband's death in 1983, and until the time of her own death in 1987, Mrs. Whiteley's income consisted solely of $435.00 a month in Social Security benefits. On the other hand, her expenses included $150 to $200 each month for medicine, a $1,000 annual deductible for medical insurance (which dropped to $500 a year in 1986), and an average utility bill of $80.00 a month.
"Following Frank Whiteley's death, Mrs. Whiteley and her children (who had access to her bank accounts) made several large purchases.
"For example, on 6 June 1983, Mrs. Whiteleywho was herself unable to drivepurchased a used 1981 Honda Accord automobile for $7,825.09. Frank Whiteley's 1973 pick-up truck was used as a trade-in. The Honda was titled in the name of `Bernice M. Whiteley or Travis L. Humphries.' Gwinnette Meyers continues to drive this car today.
"On or about April 11 or 12, 1984, Mrs. Whiteley sold the Toney Lake Farm upon which she and Mr. Whiteley had resided during his lifetime for $76,500. On 12 April 1984, $33,910.75 of the proceeds from that sale were used to purchase property on Beaver Dam Road near Toney, Alabama, upon which Mrs. Whiteley resided at the time of her death. The remaining $42,589.25 was distributed between two bank accounts at the Bank of Ardmore: $17,589.25 being deposited to the savings account opened in the name of Travis L. Humphries, and $25,000 going to joint checking account number XXXXXXX, which previously had been maintained in the names of Frank W. or Bernice Whiteley, but which obviously had been changed to a joint account upon which Travis L. Humphries also could draft checks at some time that is not established by the evidence. (That conclusion is established by the following fact: On 12 April 1984, Travis Humphries wrote a $12,300 check on the account to purchase 6.27 acres of land next door to his mother's house and land on Beaver Dam Road. Claiming that such acreage was a `gift' from his mother, Travis Humphries built a house on the property and resides there still.)
"More purchases followed, as Travis Humphries wrote several checks during the next few months. Among such purchases were the following:
28 April 1984$4,590.00 for a living room suite for Bernice Whiteley, which now is in Gwinnette Meyers' possession;
20 May 1984$1,129.22 to an attorney for fees incurred by Travis Humphries in obtaining a divorce;
6 July 1984$1,435.09 for a bedroom suite for Bernice Whiteley, which now is in Travis Humphries's possession;
6 July 1984$542.49 for a table, which now is in Travis Humphries's possession;
6 July 1984$342.40 for a bedroom suite and table, which also is in Travis Humphries's possession; and

*100 7 July 1984$1,214.46 for a couch and chair, which now is in Travis Humphries's possession.
"In addition to the foregoing, Bernice Whiteley also spent at least $2,000 for the purchase and moving of a house trailer, to permit Gwinnette Meyers and her family to live nearby. An additional $915 was expended by Mrs. Whiteley for installation of a septic tank for the trailer. Gwinnette Meyers continues to reside in that house trailer.
"On the other hand, Travis Humphries presented checks drawn on his personal account at the First Alabama Bank, totaling $7,655.31, which allegedly were expenditures on behalf of his mother out of his personal funds.
"Bernice M. Whiteley died on 30 January 1987.
"In accordance with her Last Will and Testament, Mrs. Whiteley's son (Travis Humphries) and Frank Whiteley's son (Bobby Whiteley) were appointed Co-Executors of the estate of Bernice M. Whiteley. That occurred on 6 February 1987.
"Shortly thereafter, on 16 February 1987, Bobby Whiteley wrote a letter to Travis Humphries asking him to account for the assets of the estate of Frank W. Whiteley. That letter, among other demands by defendants, prompted plaintiffs to ask this Court for a declaratory judgment defining the respective rights of the parties.

"Conclusions of Law
"It is undisputed that the Whiteleys executed mutual, or reciprocal wills, along with a separate agreement not to alter the wills. Each testamentary instrument left one spouse's entire estate to the other in fee simple, and provided that, on the death of the surviving spouse, the remainder of the estate would be divided equally among the couple's children. Defendants challenge Mrs. Whiteley's inter vivos conveyance of a substantial portion of the joint estate to her own children, in preference to her deceased husband's sons.
"The attorneysfor both plaintiffs and defendantsapproached this case as if it raised an issue novel to the law of this State. However, Alabama law exists, and it is controlling.
"`It is said in 1 Schouler on Wills, section 710, page 808, that a contract to leave one's property by will gives the promisor freedom to dispose of it during his life in good faith, unless it embraces specific property, "but any conveyance by him may be set aside if made to avoid performance or through fraud or undue influence."
"`"The weight of authority is that a contract to devise does not prevent the making of gifts during the lifetime of the promisor; but such gifts must be reasonable, absolute, bona fide, not testamentary in effect, and not made for the purpose of defeating the contract to devise, nor having such effect." Skinner v. Rasche, 165 Ky. 108, [112,] 176 S.W. 942, 944 [(1915)].
"`"Any gift made with the actual intent to defraud would be void, but none made without such intent, unless so out of proportion to the rest of [the] estate as to attack the integrity of the contract, when it would be fraudulent as [a] matter of law. The gift might be so large that, independent of intent or motive, fraud upon the contract would be imputed, or arise constructively by operation of law. Reasonable gifts were impliedly authorized. Unreasonable gifts were not, even if made without actual intent to defraud. In the absence of intentional fraud the question is one of degree, and depends upon the proportion that the value of the gift bears to the amount of the donor's estate." Dickinson v. Lane, 193 N.Y. 18, [25,] 85 N.E. 818, 820, 20 L.R.A., N.S., 1154 [(1908)].
"`Again: "To say that a person has fulfilled his agreement to give to another all of his property at his death in consideration of valuable services performed by making his will in accordance with such agreement, and then to turn right around and annul and effectively destroy such testamentary provision by conveying away all of his property to another, *101 leaving nothing whatever upon which the will could operate, would be but `keeping the word of promise to the ear and breaking it to the hope.'" Bruce v. Moon, 57 S.C. 60, [73-74,] 35 S.E. 415, 419 [(1900)]; [other citations omitted].
"`In the absence of such improper purpose, a will or a promise to make one, when supported by sufficient consideration, by which one in effect agrees to leave at his death property to another, serves to exclude that which he may in his lifetime dispose of and to include what he may acquire and own at his death. [Citations omitted.]
"`We adopt the foregoing statements and extracts as correct principles of law applicable in this State.'
"Wagar v. Marshburn, 241 Ala. 73, 78-79, 1 So.2d 303, 307 (1941). See, Schumaker v. Smith, 44 Ala. 454, 4 Am.Rep. 135 (1870). See also, Allen v. Bromberg, 163 Ala. 620, 50 So. 884 (1909); Allen v. Bromberg, 147 Ala. 317, 41 So. 771 (1906). But cf., Walker v. Yarbrough, 200 Ala. 458, 76 So. 390 (1917).
"Defendants produced several decisions from other jurisdictions establishing that the type of instruments executed by the Whiteleys have contractual aspects.
"`Where two parties contract to make a joint, mutual and reciprocal will, each pledges to the other that he will execute a mutually agreeable will, and will have that will in full force and effect at the time of death. The parties may express such contract in a separate document, state in the joint will that it is a contract, or the fact of contract may be conclusively presumed from the fact of the joint will being executed. Such contract becomes partially executed upon the death of one of the parties to the agreement and the acceptance by the survivor of properties devised or bequeathed under the will and pursuant to the agreement to make such joint will. At this point the contract becomes irrevocable, the survivor having received the consideration promised.' [In Re Estate of Chayka, 47 Wis.2d 102, at 106, 176 N.W.2d 561, at 563-64 (1970).]
"Indeed, all of the cases cited by defendants are consistent on one point: once the survivor probates the will of the first to die, and accepts the benefits of that will, that person cannot thereafter defeat the purposes of reciprocal wills through inter vivos transfers. Only one exception to that general rule has been noted: good faith transfers or sales of property which are for the purpose of meeting the daily needs and necessities of the surviving spouse are not prohibited.
"Those same cases also demonstrate that, in situations involving instruments similar to those in this case, courts will infer the intent of the parties from the instruments themselves, and, from the circumstances of the case.
"Based upon both the language of the instruments at issue here (leaving the remainder of the estates to the couple's children `in equal shares'), and, the facts established at trial, this Court concludes that Mrs. Bernice Whiteley's substantial inter vivos transfers of property to her own children were unreasonably large, and were not made in good faith (because they were not related to Mrs. Whiteley's daily needs or necessities, but instead were intended to defeat the purpose of the Whiteleys' reciprocal wills). Hence they violated the couple's written agreement, and should be set aside. Wagar v. Marshburn, supra.
"`A conveyance of property merely for the purpose of defeating a contract to make a joint will, or separate wills, with mutual and reciprocal provisions, is not to be upheld. Equity does not permit one of the parties to a contract to make a joint will, or separate wills, with mutual and reciprocal provisions, to rescind the contract by his own act in conveying the property. A conveyance made by a party to the contract for the purpose of defeating the contract may be set aside in equity as fraudulent, especially where it is of a testamentary character.' [79 Am.Jr.2d Wills § 787, at 844-845 (1975). See also id. § 792, at 849.]"
(Emphasis original.)
The standard of review applicable to judgments based on ore tenus evidence *102 is well established. "[W]here a trial court has heard ore tenus testimony, as in this case, its judgment based upon that testimony is presumed correct and will be reversed only if, after consideration of the evidence and all reasonable inferences to be drawn therefrom, the judgment is found to be plainly and palpably wrong." McInnis v. Lay, 533 So.2d 581, 582 (Ala.1988) (citation omitted). Furthermore, "[t]his Court ... will affirm the trial judge's decision if, under any reasonable aspect, it is supported by any credible evidence." Chism v. Hicks, 423 So.2d 143, 144 (Ala. 1982) (citation omitted) (emphasis added). Finally, "[t]his Court cannot overturn [the] finding[s] of fact by the lower court unless the decision is unsupported by the evidence ... and is plainly and palpably erroneous.... Further, the presumption of correctness exists even though there may be conflicting evidence." Kershaw v. Knox Kershaw, Inc., 523 So.2d 351, 356 (Ala.1988) (citations omitted) (emphasis added).
The appellants contend that Bernice's gifts to her children, in light of her failing health, were made in good faith because they were given as consideration for her children's caring for her. However, the fact that Bernice's transfers were made so quickly after her husband's death casts doubt on the bona fide nature of those transfers. The trial court heard all of the facts regarding the intent of the parties, the purpose of Bernice's transfers to her children, and the good faith of the parties, and it concluded, based on that evidence, that Bernice's gifts were not made in good faith.
Because there is "credible evidence" from the record to support the trial judge's findings and because we find that he correctly applied the law to those findings, his judgment is affirmed.
AFFIRMED.
JONES, ALMON, SHORES and HOUSTON, JJ., concur.
HORNSBY, C.J., and MADDOX and KENNEDY, JJ., dissent.
MADDOX, Justice (dissenting).
This appeal requires the Court to apply the law concerning reciprocal wills made by a husband and wife, each of whom had children by a former marriage and whose children were made beneficiaries of the estate of the surviving party. The trial judge found that the surviving spouse had violated the provisions of the reciprocal will by making inter vivos transfers to her own children to the exclusion of her stepchildren. I believe that the trial judge erred, and I would reverse.
Frank and Bernice Whiteley both had children from previous marriages; they executed reciprocal wills that contained the following clauses:
"THIRD ITEM: At my death I hereby give, devise and bequeath all the rest and residue of my estate, both real and personal, wheresoever situate, unto my spouse in absolute fee simple.
". . . .
"FIFTH ITEM: My spouse and I are executing our wills at or about the same time and such wills are intended to be and should be construed [as] contractual and reciprocal wills. Neither wills [sic] shall be subject to revocation by it's [sic] maker without the consent of the other party."
Bernice's will also contained the following:
"[I]n the event my said spouse shall predecease me, then in such event I give, devise and bequeath all my estate, both real and personal, wheresoever situate, of which I may die seized or possessed, or to which I may be or become entitled to have any interest or over which I may have any power of appointment, unto my children, Gwinnette Meads Bates and Travis Humphries, and my husband's children, Morris W. Whiteley, Bobby Whiteley, David Whiteley and Lanny Whiteley, in equal shares, share and share alike, in absolute fee simple, per stirpes and not per capita." (Emphasis added.)
Frank's will also had a similar provision to leave all his property to all their children equally in the event that Bernice died first. Frank died first, and Bernice took title to *103 all their property and began making gifts to her children.[1]
The trial judge made the following conclusions in his order:
"Based upon both the language of the instruments at issue here (leaving the remainder of the estates to the couple's children `in equal shares'), and, the facts established at trial, this Court concludes that Mrs. Bernice Whiteley's substantial inter vivos transfers of property to her own children were unreasonably large, and were not made in good faith (because they were not related to Mrs. Whiteley's daily needs or necessities, but instead were intended to defeat the purpose of the Whiteleys' reciprocal wills). Hence they violated the couple's written agreement, and should be set aside." (Emphasis original.)
When the trier of fact has the task of construing a will or a provision thereof, it must endeavor to ensure that the intent of the testator is effectuated. Bullard v. Lee, 470 So.2d 1197, 1198 (Ala.1985). "The polestar to guide a court in the construction of a will is the intent of the testator and that intent should be determined by considering the instrument as a whole and not by construing any subpart separately." McLean v. Brasfield, 460 So.2d 153, 155 (Ala.1984). It is the intent of the testator "which controls the construction of a will, and such intention is to be arrived at by reference to the entire document, read in light of the circumstances under which the will was written." Crippled Children's Foundation v. Cunningham, 346 So.2d 409, 410 (Ala.1977). As this Court stated in Black v. Black, 286 Ala. 233, 238, 238 So.2d 861, 865 (1970):
"Construction of a will is always started with the proposition that the province of the court is to ascertain the intent of the testator from the language of the will, in connection with attending facts and circumstances which may shed light upon any apparent uncertainty arising from its terms or existing by reason of such facts and circumstances."
After reviewing the record, I believe that the trial court erred in determining that Bernice's gifts should be set aside. While the statements of law that the trial judge based his decision upon are correct, the wills in question do not fit the law stated. It is obvious that the trial judge based his decision upon his interpretation of a single section of the wills when he stated that the Whiteleys left "the remainder of the estates to the couple's children `in equal shares.'" (Emphasis added.) However, the wills do not say that the survivor will leave the remainder of the joint estates to all the children equally; they say "in the event my said spouse shall predecease me, then in such event I give, devise and bequeath all my estate ... [to the children] in equal shares, share and share alike." (Emphasis added). The trial court was correct that Bernice was contractually bound not to revoke or defeat her will, but her will did not say that she would preserve the joint estate and pass it on to the children equally; it said that she would pass her estate to the children equally, and this was done.
To construe the wills as the trial court did has the effect of holding that Frank left his estate to Bernice only for her to preserve it for their children, and that conclusion is defeated by the language in Frank's will that left his estate to Bernice in "absolute fee simple." He could have left her a life estate or he could have limited her ability to deplete his estate if that had been his intent.
*104 The lawyer who drafted these wills testified that he discussed a number of options with the Whiteleys, that they expressed the desire to have all the deceased spouse's property pass to the other, that they did not want to restrict the right of the survivor to use the property in any manner the survivor wanted, and that they specifically rejected the option of using testamentary trusts or life estates. Both of the Whiteleys were in poor health when these wills were executed, and they expressed the desire that the survivor not be encumbered, especially in regard to the sale of any real estate. While the Whiteleys also expressed a desire to have all the children share equally in what was left after both of them died, they specifically told the lawyer that they wanted the survivor to have complete control over the property despite his warnings that the survivor could deplete the estate under these wills.
Furthermore, the majority's blanket approval of the trial court's decision means that Bernice's children will have to pay back moneys and return gifts that were made to them in return for their care of their mother. The trial court never took into account the facts that Bernice's children cared for her and provided for her needs and that some of the moneys given to Bernice's son were paid back. Thus, the holding of the majority is clearly inequitable. I do not see how the gifts, such as a fairly inexpensive house trailer, furniture, and a septic system to Bernice's daughter, could be only an improper device to circumvent the reciprocal wills. The daughter moved all the way from Houston, Texas, with her family, in order to care for her ailing mother, and the majority says that the living provisions that the mother made for the daughter in return were improper and were designed only for circumventing the wills. Such a conclusion is baffling, to say the least.
I must dissent.
HORNSBY, C.J., concurs.
NOTES
[1] These gifts included cash, furniture, real estate, a mobile home, the installation of a septic tank, and half the payments on an automobile. The trial court determined that the total value of these gifts was over $50,000. However, there was ample evidence that these gifts were in return for her children's taking care of her. There was testimony that Bernice had had asthma, bronchitis, crippling arthritis, a heart condition, emphysema, and high blood pressure, and that she took 27 different kinds of medicine. Bernice's daughter moved from Houston, Texas, in order to care for her mother, and Bernice provided the trailer next door for her daughter to live in while tending to her mother. There was also testimony that some of the gifts were repaid by Bernice's son and that he also paid for some of his mother's debts from his own money.

The trial judge did not take into account the son's payments or the need for Bernice to be cared for when he made his calculations of how much the gifts were.